UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA S. DANIELS,

      Plaintiff,                          Civil Action No. 16-10390

v.                                   HON.  PAUL D. BORMAN
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Melissa S. Daniels ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded for further administrative proceedings.

## PROCEDURAL HISTORY

      On November 13, 2012, Plaintiff file an application for DIB, alleging disability as

-1-

of October 7, 2011 (Tr. 117).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on April 10, 2014 in Oak Park, Michigan before Administrative Law Judge ("ALJ") Timothy C. Scallen (Tr. 31).  Plaintiff, represented by attorney Frank Cusmano, testified (Tr. 34-58), as did  Vocational Expert ("VE") Scott Silver (Tr. 59-63). On May 29, 2014, ALJ  Scallen found that Plaintiff was not disabled at any time through her date last insured for DIB of December 31, 2013 (Tr. 23-24).  On November 30, 2015, the Appeals Council denied review (Tr. 1-5).  Plaintiff filed for judicial review of the final decision on February 3, 2016.

## BACKGROUND FACTS

Plaintiff, born September 21, 1982, was 31when the ALJ issued his decision (Tr. 24, 117).   She completed three years of college and received training as an administrative assistant (Tr. 136).  She worked previously as a cashier, nurse, and as a nurse/case manager (Tr. 137).  She alleges disability due to fibromyalgia, chronic pain, chronic fatigue syndrome, depression, anxiety, muscle stiffness, central vestibular dysfunction, a history of falls, cognitive impairment resulting from fibromyalgia, and bowel problems (Tr. 135).

### A.     Plaintiff's Testimony

Plaintiff offered the following testimony.

She obtained an Associate's Degree and last worked on October 7, 2011 (Tr. 34). Prior to that time, she was a home care nurse (Tr. 34).  She stopped working due to memory problems (Tr. 34).  Testing for a brain tumor was negative (Tr. 35).  She experienced

difficulty with mobility due to overall body pain (Tr. 35). The body pain had become worse since she stopped work (Tr. 36). On a scale of one to ten, her body pain fluctuated between "four" and "seven or eight" (Tr. 36). She also experienced fatigue (Tr. 36). She coped with the condition by taking Norco and reclining or sitting for around 75 percent of her waking hours (Tr. 36-37). She took two or three naps a week (Tr. 37). She experienced short-term and long-term memory lapses (Tr. 38). She was limited to lifting around 30 pounds (Tr. 38). Her pain was eased by reclining with her legs at hip level (Tr. 39). She was unable to sit for more 30 minutes at a time or stand or walk for more than 15 (Tr. 39). She required the use of a cane or shopping cart for balance but did not require it for walking short distances (Tr. 39). She stated that she was unable to walk even one block without a stopping (Tr. 40). She experienced problems using stairs (Tr. 41). She currently stood 5' 3" and weighed around 220 pounds (Tr. 41). She had put on weight since stopping work due to inactivity (Tr. 41). She was able to perform a variety of postural activities, albeit with pain (Tr. 42). She did not experience problems reaching but experienced hand stiffness, tingling, and numbness (Tr. 42-43). Her hand symptoms had improved lately (Tr. 43). She did not experience problems using buttons and zippers (Tr. 45). Although she had a diagnosis of central vestibular dysfunction, the condition had improved (Tr. 43). While she used to lose her balance due to dizziness, the spells were limited to a couple of times a week for 10 to 20 minutes (Tr. 44). She had not had a fall in the last month or two (Tr. 44).

Plaintiff took care of daughter during the day (Tr 45). She was able to take care of

her personal needs (Tr. 45). Her husband had to help her get out of the bathtub on occasion (Tr. 46). She avoided social interaction due to her short-term memory loss (Tr. 46-47). Most of her social activity was limited to interacting with her family (Tr. 47). She did not experience problems at the movies, restaurants, or malls (Tr. 47).

On a typical day, Plaintiff arose between 9:30 and 11:30 (Tr. 47). She experienced morning stiffness (Tr. 48). She made a simple meal and then sat in a reclining chair for several hours before she was able to play with her daughter (Tr. 48). She experienced anxiety and panic attacks characterized by racing thoughts and sweating (Tr. 48). She experienced attacks between twice a week and twice a month for around 30 minutes (Tr. 49). She took Xanax when she felt an attack beginning (Tr. 49). She performed household chores in increments of 10 to 20 minutes due to pain and fatigue (Tr. 49).

In response to questioning by her attorney, Plaintiff reported that she had juvenile rheumatoid arthritis as a child but that condition resolved in her early 20s (Tr. 51). She testified that she was diagnosed with central vestibular dysfunction in 2011, and later with fibromyalgia (Tr. 51). Plaintiff reported that due to brain fog associated with fibromyalgia, she experienced difficulty expressing her thoughts (Tr. 52). Her body pain was worse in the back and legs (Tr. 52). The area of pain varied from day to day (Tr. 53). The body pain and communicative problems were exacerbated by stress (Tr. 53). She often lost her train of thought in the middle of a conservation (Tr. 54). She took Adderal to cope with fatigue, Prozac for depression, and Flexeril for pain (Tr. 55). She experienced the side effect of

-4-

morning lethargy and dizziness from Flexeril (Tr. 55).  She was able to care for her daughter by making sure that the daughter was on her sleep schedule (Tr. 56).  Plaintiff experienced problems opening jars (Tr. 57).  In addition to the cane, she used a back brace (Tr. 57).  She used a wheel chair instead of walking for long distances (Tr. 58).  Plaintiff's "bad" days, occurring two to three days a week, were characterize by intense pain (Tr. 58).  Her pain was exacerbated by rainy weather (Tr. 58).

### B.    Medical Evidence

### 1.  Treating Sources

In November, 2010, Plaintiff was diagnosed with acute cholelithiasis and underwent the laparoscopic removal of her gallbladder (cholecystectomy) (Tr. 199-224).  Treating records note a diagnosis of depression and rheumatoid arthritis (Tr. 199).

On October 7, 2011, Plaintiff sought emergency treatment for dizziness, confusion, and racing thoughts (Tr. 244, 254, 343).  A neurological examination and a CT of the brain were  normal (Tr. 236, 238, 254, 288, 393).  She was discharged the same day in stable condition (Tr. 245).

The following month, Rafia Khalil, M.D. examined Plaintiff, noting a possible diagnosis of fibromyalgia (Tr. 302).  Treating notes from the same month note a normal memory (Tr. 287).  Plaintiff reported joint pain and muscle weakness (Tr. 281).  In December, 2011, Dr. Khalil, noting Plaintiff's report of worsening pain due to the weather, remarked that a knee x-ray was normal (Tr. 299).

Also in December, 2011, psychologist Dr. Nancy Rietdorf assigned Plaintiff a GAF of 54 with a "guarded" prognosis due to depression and fibromyalgia[1] (Tr. 414). Plaintiff reported that she enjoyed reading, being outside, and walking at the mall (Tr. 413). Dr. Rietdorf, noting Plaintiff's statement that her student loans would be forgiven if she were found to be disabled, remarked that Plaintiff was possibly motivated by "a secondary gain for disability[]" (Tr. 411). She noted that Plaintiff appeared to be "positioning herself for disability" (Tr. 411).

In January, 2012, Amy Vilas, PA, completed an assessment, finding that Plaintiff was limited to walking or standing for one hour a day and sitting for two (Tr. 266). She found that Plaintiff could lift or carry up to 50 pounds on a frequent basis (Tr. 266) but was disabled from all work (Tr. 267). The same month, Dr. Khalil was doing "somewhat better" but continued to experience joint pain (Tr. 297, 322). Plaintiff reported an improvement in symptoms from Cymbalta (Tr. 297). In March, 2012, Dr. Khalil recommended massage therapy (Tr. 294, 320). The same month, Nick Reina, M.D. noted that Plaintiff was fully oriented but appeared "pained and anxious" with a normal gait (Tr. 318). He prescribed Ultram, noting that trigger point testing yielded "0/4 false positives" (Tr. 318). Later the same month, Dr. Reina, noting Plaintiff's report that Ultram did not control her pain,

---

[1] A GAF score of 51 to 60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *DSM–IV–TR at 34. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV–TR*"), 34.

prescribed Vicodin (Tr. 314).

In May, 2012 Sharon Mitchell, M.D. completed a fibromyalgia questionnaire, noting the conditions of fibromyalgia, rheumatoid arthritis, chronic fatigue syndrome, and central vestibular dysfunction (Tr. 262). She noted the presence of irritable bowel syndrome ("IBS"), anxiety, and depression (Tr. 262). She found that Plaintiff's pain would interfere with her work on a frequent basis and that the conditions were worsened by changing weather, fatigue, movement/overuse, and cold (Tr. 263). She found Plaintiff capable of "low stress" jobs (Tr. 263). She found that Plaintiff was unable to walk even one block and was unable to sit, stand, or walk for even two hours in an eight-hour workday (Tr. 264). She found that Plaintiff would be required to walk 5 minutes every 90 minutes and required a job with a sit/stand option (Tr. 264). She found that Plaintiff did not require the use of a cane (Tr. 264). She found that Plaintiff did not require leg elevation and could lift 20 pounds occasionally and 10 frequently (Tr. 264-265). She found that Plaintiff was capable of reaching only 25 percent of the workday but did not experience additional manipulative limitations (Tr. 265). She found that Plaintiff's conditions would require her to miss more than four days of work each month (Tr. 265).

The same month, Rafia Khalil, M.D. found that due to fibromyalgia, Plaintiff was incapable of even low stress jobs (Tr. 271). He found that she was unable to sit, stand, or walk for even two hours in an eight-hour workday (Tr. 272). He found that Plaintiff would be required to walk for five minutes every 20 minutes (Tr. 272). He did not find the need for

leg elevation (Tr. 272). He found that Plaintiff could lift up to 20 pounds on an occasional basis (Tr. 273). He found that Plaintiff's manipulative activity would be limited to 20 percent of the workday and that she would be required to miss work more than four days each month (Tr. 273).

In July, 2012, Dr. Khalil noted Plaintiff's report of worsening symptoms (Tr. 275, 291). The same month, Dr. Reina noted that Plaintiff's symptoms were "poorly controlled" (Tr. 308). Dr. Mitchell's records from the same month note Plaintiff's report of ongoing depression (Tr. 337). In August, 2012, Plaintiff reported no change in symptoms (Tr. 304). November, 2012 records by PA Vilas state that Vicodin decreased Plaintiff's symptoms (Tr. 435). Dr. Mitchell's December, 2012 records note a tearful affect (Tr. 330).

In September, 2013, Hemlata Amin, M.D. noted Plaintiff's report of level "seven" back pain and "pins and needles" pain of the arms and legs (Tr. 415-424). Plaintiff reported sleep disturbances and the inability to walk even short distances (Tr. 419). She stated that her level of pain remained the same (Tr. 419). Plaintiff exhibited normal muscle strength but substandard reflexes (Tr. 421). Dr. Amin found trigger points in the cervical, thoracic, and lumbar spine (Tr. 422).

In January, 2014, Dr. Mitchell completed an assessment of Plaintiff's work-related abilities, noting a "guarded" prognosis due to fibromyalgia, chronic fatigue syndrome, depression, and confusion (Tr. 426). She found that Plaintiff was incapable of even low stress jobs (Tr. 427). She found that Plaintiff could sit for more than six hours a day, but

-8-

walk or stand for less than two (Tr. 428). She found that Plaintiff did not need to walk periodically over the course of the workday but required a sit/stand option (Tr. 428). She found that Plaintiff was limited to lifting 10 pounds on a frequent basis and 20 pounds "rarely" (Tr. 428). She found that Plaintiff could perform postural activities "rarely" but did not experience manipulative limitations (Tr. 429). She found that Plaintiff would be expected to miss more than four days a month due to her medical conditions (Tr. 429).

## 2. Non-Treating Sources

In March, 2013, psychologist Michelle M. Rousseau performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of fibromyalgia, chronic fatigue syndrome, central vestibular dysfunction, and bowel impairment (Tr. 400). Dr. Rousseau observed good hygiene, a normal gait, good communication skills, and clear and understandable speech (Tr. 400). Dr. Rousseau noted that Plaintiff had driven herself to the appointment and although she alleged the need for a cane, back brace, and knee braces, she did not use any assistive devices at the appointment (Tr. 400). Plaintiff reported anxiety when thinking about finances or health, but indicated that symptoms of anxiety had subsided with Xanax use (Tr. 401). She reported that she was able to perform household chores on a limited basis (Tr. 401-402). Her past interests included walking at the mall, but her interests were currently limited to watching television and reading comic books (Tr. 402). Dr. Rousseau observed that Plaintiff exhibited "mild problems with attention and concentration" (Tr. 403). Dr. Rosseau found that Plaintiff was able to "independently engage

in a number of adaptive activities of daily living with the aid of prompts and organizational

tools" (Tr. 405).  She noted intact social functioning with the ability to "interact adequately

with co-workers, supervisors, and the general public" (Tr. 405).  She assigned Plaintiff a

GAF of 61[2] (Tr. 405).

In April, 2013, Joe DeLoach, Ph.D. performed a non-examining psychological review

of the treating records on behalf of the SSA, finding the presence of an affective disorder and

anxiety (Tr. 72).  He concluded that Plaintiff experienced mild limitation in activities of daily

living and moderate limitation in social functioning and concentration, persistence, and pace

(Tr. 72).  He found that Plaintiff was capable of "simple tasks" on a "sustained basis" (Tr.

77).

## C.   Vocational Expert Testimony

VE Scott Silver classified Plaintiff's past relevant work as a nurse (hospice) and nurse

(general duty) as skilled and exertionally medium and cashier, semiskilled and exertionally

light[3] (Tr. 60).  The ALJ then posed the following set of hypothetical restrictions, taking into

---

[2]

GAF scores in the range of 61 to 70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning."  *DSM–IV–TR* at 34.

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

account Plaintiff's age, education, and work history:

> [L]ight [exertional] level.  Also limited to occasional climbing of stairs and
> ramps.  No climbing of ropes, laders or scaffolds.  Furthermore limited to
> occasional balancing, stooping, kneeling, crouching and crawling.
> Furthermore, limited to avoiding concentrated exposure to unprotected heights,
> moving machinery, extreme hot and cold temperatures.  Also limited to simple,
> routine, repetitive tasks.  I'll say no interaction with the public as well as
> coworkers.  Only superficial contact with coworkers.  With just those
> limitations alone, could she do her past work? (Tr. 60).

Based on the above restrictions, VE testified that the hypothetical individual would
be unable to perform Plaintiff's past relevant work but could perform the light, unskilled jobs
of a small products assembler (3,200 positions in the State of Michigan); office helper
(2,900); and collator (9,400) (Tr. 60-61).   The VE testified that if the individual were limited
to frequent handling and fingering, the assembler and collator positions would be eliminated
(Tr. 61).   The VE testified that the the office position would allow for two 15-minutes breaks
and one 30-minute break in an eight-hour work period and one absence each month (Tr. 61).
He noted that the individual would need to be on task at least 90 percent of the day (Tr. 62).
He testified that if Plaintiff's alleged symptoms were fully credited, all work would be
precluded (Tr. 62).

In response to questioning by Plaintiff's attorney, the VE stated that if the individual
were limited to walking for one hour a day, she would be limited to sedentary work (Tr. 63).
He found that the need to elevate the legs during scheduled breaks would not effect the job
findings but that the need to elevate the legs to table level during the work period would
eliminate all work (Tr. 63).

-11-

### D.     The ALJ's Decision

Citing Plaintiff's treating records, ALJ Scallen found that Plaintiff experienced the severe impairments of "fibromyalgia, chronic fatigue syndrome, history of gallbladder disease status post laparoscopic cholecystectomy; arthritis of the knees, history of central vesibular function, obesity, depression, and anxiety," but that none of the impairments met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 16). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, and pace (Tr. 17). He found that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> [O]nly occasional climbing of ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; work that would avoid concentrated exposure to unprotected ehights, moving machinery, as well as extreme hot and cold temperatures; simple, routine, repetitive tasks; no interaction public; and only superficial contact with coworkers (Tr. 18).

Citing the VE's findings, the ALJ found that while Plaintiff was unable to perform any of her past relevant work, she could perform the light, unskilled work of a small products assembler, office helper, and collator (Tr. 23).

The ALJ discounted Plaintiff's allegations of limitation, citing November, 2011 records showing only level "three" pain; a March 2012 report that pain was managed with medication; and November, 2012 records showing that Vicodin was effective in relieving body pain (Tr. 19). He cited December, 2011 treating notes stating that Plaintiff enjoyed

"walking in the mall" (Tr. 20). The ALJ noted that the third party function report by Plaintiff's husband stated that Plaintiff cared for their daughter while he was at work but that Plaintiff's account stated that she received child care help from relative "one to seven days at a time" (Tr. 20). He noted that at the hearing, Plaintiff testified that she cared for her daughter without help while her husband was at work (Tr. 20).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

-13-

whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues that the ALJ's rejection of Dr. Mitchell's and Dr. Khalil's disability opinions was not well support or explained.  *Plaintiff's Brief* at 9-14, *Docket #19,* Pg ID 505.

She contends, in effect, that the "favorable" treating records cited by the ALJ either refer to conditions other than the ones constituting disability, or rely on short-lived improvements in symptoms. *Id.* She contends that the analysis ignores the great weight of evidence supporting a disability finding. *Id.* She argues further that the ALJ erred by discounting the opinion of PA Vilas. *Id.* at 14-16.

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)*(citing Wilson,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, see *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2))[4]. The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's

---

[4]
 In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

The ALJ discounted Dr. Mitchell's opinion that Plaintiff was unable to perform even sedentary work on the basis that treating notes from the same day show "check marks for all symptoms being within normal limits" (Tr. 20 *citing* 338). The ALJ is correct that the records from the same day do not show any *urgent* neurological or balance problems (Tr. 338). However, the May, 2012 treating records, read in their entirety, note the conditions of chronic fatigue, central vestibular dysfunction and depression (Tr. 338). The notes show that Plaintiff was currently prescribed Norco for body pain (Tr. 338). Further, while the ALJ at least acknowledged that Dr. Mitchell was a treating source, his findings contain no indication that he considered the length and nature of the treatment in making his findings. The transcript shows that Plaintiff received treatment from Dr. Mitchell at least as far back as November, 2010 (Tr. 329-399). Moreover, the records from November 1, 2011 forward by rheumatologist Dr. Khalil show (1) that Plaintiff was apparently referred by Dr. Mitchell to Dr. Khalil for suspected autoimmune disorders and, (2) that Dr. Khalil consistently shared his treatment notes with Dr. Mitchell from November, 2011 (diagnosis of fibromyalgia) to the end of May, 2012 (Tr. 293, 295, 298, 300, 302). In addition, Dr. Mitchell's opinion was

presumably informed by the March, 2012 treating records of pain specialist Dr. Reina, who reported that a trigger point test was positive for fibromyalgia and that narcotic pain medication was appropriate (Tr. 318). In summary, the ALJ's one "reason" for according no weight to Dr. Mitchell's treating opinion does not satisfy the "good reasons" requirement of § 1527(c)(2).

The ALJ finding that Dr. Khalil's May, 2012 opinion had "no persuasive weight" is also problematic (Tr. 21). The ALJ supported his finding by noting that his treating notes showed that Plaintiff reported in May and July, 2012 that her knee pain was better with injections and "that her overall pain was better with Vicodin and Flexeril" (Tr. 21). However, the records cited by the ALJ do not reflect the true import of Dr. Khalil's treating records showing that Plaintiff's pain remained the same or worsened between the end of 2011 and the end of 2012. For example, Dr. Khalil's July, 2012 records note worsening symptoms (Tr. 275, 291). Notably, the same month, Dr. Reina noted that the symptoms of fibromyalgia were "poorly controlled" (Tr. 308). Dr. Mitchell's notes, also from July, 2012, state that Plaintiff continued to experience depression (Tr. 337). Plaintiff reported no change in symptoms the following month (Tr 304). Dr. Mitchell's December, 2012 records note a tearful affect (Tr. 330). While the ALJ rejected Dr. Khalil's May, 2012 opinion, in part, because no examination was performed the same day, the transcript shows that he examined Plaintiff on numerous occasions in the six months prior to issuing an opinion.

The ALJ speculated that "the possibility always exists that a doctor may express an

opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another" (Tr. 21). The ALJ noted that he could not confirm "such motives," but he found that they were "more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." However, for the reasons set forth above, Drs. Mitchell's and Khalil's opinions did not "depart substantially" or even modestly from the treating records. While the ALJ cites Dr. Reitdorf's December, 2011 opinion that Plaintiff "seem[ed] to be positioning herself to be disabled," the psychologist's findings, made within the first month of the treating relationship, are not borne out by the remainder of the records, none of which suggest that Plaintiff exaggerated her symptoms or limitations for secondary gain (Tr. 411).

In contrast, the ALJ did not err in discounting PA Vilas' January, 2012 disability opinion. While PA Vilas is not an "acceptable medical source," her opinion "is entitled to consideration due to his expertise and long-term relationship" with Plaintiff. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); 20 C.F.R. §§ 404.1502, 404.1513. Moreover, in weighing the opinions of "other sources," it is "appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–3p, *2, 2006 WL 2329939, *2 (August 9, 2006).

However, the ALJ acknowledged that Vilas' opinion was entitled to some consideration. Further, his finding that the Vilas' treatment records did not support the

"disability opinion" is supported by the fact that Plaintiff did not allege disabling symptoms until only three months before Vilas' issued her opinion. Further, the "disability" opinion does not appear to be a statement that Plaintiff would be disabled for 12 months or longer as required by the Social Security regulations, but rather, that she was presently unable to return to work. Notably, Vilas' did not opine that Plaintiff was permanently disabled, stating that the "return to work" date was "unknown" (Tr. 267).

While the analysis of Drs. Mitchell and Khalil warrant a remand for clarification and further fact-finding, the ALJ did not err in rejecting PA Vilas' opinion of disability.

### B. The RFC

In her second argument, Plaintiff contends that the RFC found in the administrative determination is not supported by substantial evidence. *Plaintiff's Brief* at 16-20. She argues that the RFC for a limited range of light work "mimics" the findings of the non-medical Single Decision Maker ("SDM") Steven Vasco. *Id.* at 17-19 (*citing* Tr. 18, 74-76). She notes that the ALJ's reliance of the SDM's non-medical findings constitutes error. *Id.*

In response, Defendant argues that the ALJ was not required to "mirror" any of the medical opinions, but rather base the RFC on all of the "medical and non-medical evidence" *Defendant's Brief,* 23-24, *Docket #24,* Pg ID 552 (*citing Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. September 5, 2013)).

To be sure, Defendant is correct that the ALJ was free to craft an RFC based on all of the evidence. However, Plaintiff points out that the ALJ's conclusion are identical to a

Single Decision Maker's ("SDM's") April, 2013 non-examining review of the treating records (Tr. 18, 74-76). In an ALJ's determination, "RFC forms completed by SDMs are 'not opinion evidence'" *Lindsey v. Commissioner of Social Sec.,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013) (*citing* The Programs Operations Manual System ("POMS") DI § 24510.05)). "'[U]nder the regulations and agency policy, SDM assessments have no place in an ALJ's disability determination.'" *Id.* (*citing White v. Comm'r of Soc. Sec.,* 2013 WL 4414727, *8 (E.D.Mich. Aug.14, 2013)).

The fact that the ALJ did not cite the SDM's findings does not resolve the question of whether the ALJ relied on them to craft the RFC. The RFC for light work, with occasional climbing of ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling (Tr. 18) is identical to the SDM's findings (Tr. 18, 74-75). As in the SDM's assessment, the RFC also included an avoidance of "hazards," listed in the RFC as "concentrated exposure to unprotected heights" and "moving machinery" (Tr. 18, 75-76). In fact, the RFC deviates from the SDM's assessment of the physical limitations by adding avoidance of "extreme hot and cold temperatures" (Tr. 18). The de facto adoption of the SDM's findings is of particular concern, given that the remainder of medical transcript does not contain any consultive or treating opinion that Plaintiff was capable of walking or standing for six hours in an eight-hour workday as required for exertionally light work.

I recommend that upon remand, the ALJ provide a rationale for his finding that Plaintiff could perform exertionally light work, independent of the findings by the SDM.

### C.  The Credibility Determination

Plaintiff argues last that the ALJ's credibility determination, like the treating physician analysis, is based on a mis-characterization of the records.  *Plaintiff's Brief* at 20-26. Plaintiff faults the ALJ for citing her report of level "three" pain in November, 2011, but ignoring the records form the next month showing level "six," January, 2012 records showing "five," March, 2012 records a "seven to eight," and January, 2014 records, "seven" (Tr. 336-338, 485-488).  In particular, Plaintiff disputes the ALJ's statement that the March, 2012 records showed that her pain was controlled by medication, when in fact, he acknowledged that the notes from the same month state that the pain was "poorly controlled" (Tr. 19).   Plaintiff notes further that while the ALJ cited the July, 2012 records to illustrate an improvement in her condition, the gist of the records do not support such a conclusion.  The records from that month note a worsening symptoms (Tr. 275, 291), a notation that the symptoms were "poorly controlled" (Tr. 308), and  ongoing depression (Tr.  337).

It is well established that "an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (*citing Walters v. CSS,* 127 F.3d 525, 531 (6th Cir. 1997); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)) (*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

My own review of the transcript supports Plaintiff's argument that the ALJ mis-

characterized the substance of the treating records in large part.  Further, while the ALJ supports the credibility determination by stating that Plaintiff's limitations in daily cannot be "objectively verified with any reasonable degree of certainty," this is true of all disability cases; the fact that the ALJ cannot follow her around all day for verification of the professed limitations cannot be used to discount her claims (Tr. 20).  Although the ALJ properly found that Plaintiff's earlier claim that she required family help to take of her daughter contradicted her husband's report that she took of the child by herself during the day, the misrepresentation of the treating records supports a remand for further proceedings.  The deficiencies in the credibility determination are particularly critical in the present case where Plaintiff alleges disability resulting from fibromyalgia.   "Given the nature of fibromyalgia, where objective evidence is elusive and subjective complaints are central to diagnosis and treatment, providing justification for discounting a plaintiff's credibility is particularly important." *Castro v. CSS.*, 2013 WL 4012824, *12 (E.D.Mich. August 6, 2013) (Binder, M.J) (citing Kalmbach v. CSS, 409 F. App'x 852, 863–64 (6th Cir. January 7, 2011).

In closing, I note that despite significant errors discussed in all three sections, the present transcript does not show an "overwhelming" case for disability.  While Plaintiff is not automatically entitled to an award of benefits, a remand is clearly required for further fact-finding and consideration consistent with the above findings.  *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171 (6th Cir.1994).

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding the case for further administrative proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall

-23-

address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: February 28, 2017

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on February 28, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager

-24-